J-S03017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | No. 1015 WDA 2024 |

Appeal from the Order Entered July 16, 2024
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  2023-00042

| | | |
|---|---|---|
| IN THE INTEREST OF: L.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | No. 1016 WDA 2024 |

Appeal from the Order Entered July 16, 2024
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  2023-00042A

| | | |
|---|---|---|
| IN THE INTEREST OF: R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | No. 1017 WDA 2024 |

Appeal from the Order Entered July 16, 2024
In the Court of Common Pleas of Blair County
Orphans' Court at No(s):  2023 AD 42B

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: MARCH 6, 2025**

A.D. ("Father") appeals from the decrees granting the petitions filed by A.M. ("Mother") and her husband ("Stepfather"), to involuntarily terminate Father's parental rights to his children, E.D., born in March 2012, L.D., born in November 2013, and R.D., born in June 2016 (collectively, "the children"). We affirm.

Father and Mother married in 2011 and separated in 2020 and have each remarried. **See** N.T., 3/28/24, at 14-15. Father has been in United States military service since the beginning of the marriage. During the marriage they lived in North Carolina. When they separated; Father relocated to Alabama. He now lives in South Korea. **See id**. at 15-16.

In November 2023, Mother and Stepfather filed an involuntary termination petition. The Orphans' Court held hearings in March and June 2024 on the petition.[1]

Mother testified to the following: Father had a limited relationship with the three children, all of whom have special needs, during the marriage: he worked daily from 5:00 a.m. until 6:00 or 7:00 p.m. and was away from home other times on training exercises or deployment that could last two or three months at a time. **See** N.T., 3/28/24, at 16-17. As a result of Father's

---

[1] The court determined at the beginning of the first hearing the children's guardian *ad litem* ("GAL") could represent their best interests and legal interests without conflict. **See** N.T., 3/28/24, at 5-7.

schedule and his preference for solitary activities when he was at home,[2] Mother served as primary caregiver. *See id*. at 17-18. The children did not ask for Father when he was not at home; even during FaceTime calls, the children had little interest in prolonged interaction with him. *See id*. at 18-19.

Mother testified when she and Father separated in 2020, they agreed Father would have visitations at least once a month and on holidays when he was able to travel. *See id*. at 19-20. In June 2021, Father and Mother entered into a consent agreement in North Carolina, under which Father had in-state custody of the children for fourteen days, seven of which were to be consecutive, from 11:00 a.m. to 6:00 p.m. *See id*. at 21-23.[3] Father missed the first visitation, did not take the children on every allotted visitation, and did not see them between June 2020 and December 2022,[4] a period of roughly two-and-one-half years, when he was in Alabama, Austin, Texas, and later South Korea, although he did see them for ten-to-twelve minutes periodically on Google Meet.[5] *See id*. at 19-20, 23-25.

---

[2] Mother testified Father spent thousands of hours working on "Warhammer" figurines in the garage. *See* N.T., 6/14/24, at 11.

[3] Mother, Stepfather, and the children are all now Pennsylvania residents.

[4] Father admitted in his testimony that he chose to visit Austin, Texas during a January 2021 visit to the United States and did not see the children. *See* N.T., 6/14/24, at 99.

[5] Mother testified Father has a double monitor and appeared to be playing computer games during video visits with the children. *See id*. at 76.

Mother testified Father, his mother, and his sister, visited the children five of seven days in December 2022. He did not visit them again until May 2023. *See id*. at 28-29.[6] Over the course of the period from the separation forward, the parties spoke constantly about Father's desire to reduce his support obligation. *See id*. at 30-31.

E.D., the couple's oldest child, has special needs including autism and ADHD. *See id*. at 32, 47. Father failed to attend, physically or virtually, quarterly meetings to formulate E.D.'s individualized education plan ("IEP") or inquire about the result of those meetings, despite Mother's encouragement. *See id*. at 34-35, 41. The parties entered into an agreement in December 2023, stating they would explore ways for Father to be involved with all three children's therapy; he did not do so. *See id*. at 36-37. E.D. had five months of counseling relating in part to misbehavior she attributed to coping with Father's absence. *See id*. at 37-38, 44-47. She subsequently disengaged from him and does not want to be part of court-ordered phone calls; her parental bond is with her stepfather, whom she calls "Dad." *See id*. at 38-40. Stepfather helps E.D. with her homework; Father never has and has never read to her. *See id*. at 41-42. Father has similarly refused to participate in L.D.'s occupational therapy and is not involved with her health or educational needs. *See id*. at 43-44, 64-65.

---

[6] A May 2023 consent order granted Father progressively more access to the children over three years, including overnight, unsupervised visits in the third year. *See id*. at 29-30.

Mother testified in December 2022, she and Father met to talk about the children, but Father instead discussed reducing his support obligation because his prospective wife demanded it as a condition of marrying him. *See* N.T., 3/28/24, at 61. Father declared he would not make sacrifices for the children and asked Mother to write an apology to his prospective wife for making his life so hard. *See id*. at 62-64. Mother wrote the letter. *See id*. at 64.

Mother testified R.D. has ADHD, speech delay, and celiac disease, which requires focused attention to his diet. *See id*. at 65-68. Stepfather is intensely involved in treating these conditions; Father is not involved. *See id*. at 69-74. R.D. has a parental bond with Stepfather. *See id*. at 75.

Mother testified Father has never participated in the children's extracurricular activities and did not attend their first day of school in August 2023, although he was nearby and could have done so. *See id*. at 79-80. He does not interact with the children's teachers, does not attend their medical or dental appointments, has never attended their therapy sessions, never bought clothing or school items for the children, and never taught them personal hygiene, or planned their birthday parties. *See id*. at 80-83. Father's lack of cooperation has prevented R.D. from being baptized. *See id*. at 83-84. Father missed numerous scheduled phone calls with the children. *See id*. at 97-99. In the six months prior to the filing of the termination petition, Father had no role in raising the children. He has told E.D. he will never move to Pennsylvania. *See id*. at 84-91.

Mother testified Father never discussed with the children his engagement to his new wife and their subsequent marriage. Father told Mother his new wife had no interest in being a stepmother. *See id*. at 103-12. Stepfather, whose bond with the children is "unbreakable," plans to adopt the children if Father's parental rights are terminated. *See id*. at 112-15. The children would not be affected by termination of Father's parental rights. *See id*. at 115-16.

When the hearing resumed in June 2024, Mother testified Father participated in six of twenty-two available phone calls between the hearings; and the children have no interest in talking to him. *See* N.T., 6/14/24, at 3-4, 29-31. Father never asks how the children are doing in school, or about their health or activities; he talks about his cats and his army service. *See id*. at 5-7. Father has not made any attempts to co-parent since the prior hearing. *See id*. at 7. He has also refused to comply with a court order for family counseling. *See id*. at 7-8, 22-23.

Stepfather testified he performs all the responsibilities of a father, loves the children as if they were his birth children, wants to adopt them, and understands the support obligation he would be assuming. *See id*. at 42-65. Stepfather testified he attends to E.D.'s daily dietary, educational, health, and financial needs and is engaged with every aspect of the children's lives. *See id*. at 47-49. Like E.D, L.D. also has autism. Additionally, she has ADHD, delayed speech, social anxiety, and other special needs. Father has almost never assisted with those conditions, and did not attend a recent meeting in

Pittsburgh to address them. *See* N.T., 3/28/24, at 50-57.[7] L.D. has no bond with Father, does not enjoy video calls with him, and calls Stepfather "Dad." *See id*. at 57-61.

Father testified his relationship with the children was improving in the Summer of 2023 until October, when he was no longer able to reach them on their cellphones. He believed the children's subsequent disinterest in him seemed "very scripted." *See* N.T., 6/14/24, at 68-71. He said he did not include them in his wedding plans based on his own painful experience with his father's remarriages. *See id*. at 71-73. He said he had a plan to help with math but it "just never happened," and he figured it was easier for Mother to do it because she was physically there and has a degree in child education. *See id*. at 78-79. He testified Mother insisted on an increase in child support in Spring 2023, before she allowed his mother to speak to the children. *See id*. at 81-85. He testified he would be open to participating in family therapy. *See id*. at 89-90. Father testified he believe the children are being "coached" in their responses to him. *See id*. at 92.

Father testified that in the six months prior to the filing of the termination petition, he had deferred to Stepfather the responsibility for input in the children's medical treatment, despite the fact he had shared legal custody of the children. *See id*. at 111. He stated he does not speak to the

---

[7] Father was visiting in August 2023, and did attend a meeting concerning E.D., but had only minimal participation. *See* N.T., 3/28/24, at 57-58.

children's doctors because Mother keeps him informed. *See id*. at 112-14. He could not recall the last time he took an active role concerning E.D.'s or L.D.'s autism. *See id*. at 115-17. He stated, incorrectly, that R.D. has autism. *See id*. at 118. Father could not recall the name of E.D.'s school, has not attended an online school conference since at least January 2023, and did not request a copy of E.D.'s report card. *See id*. at 120-21. He did not correctly recall what grade L.D. was in and had not sought her report card. *See id*. at 122. He could not recall any specifics about R.D.'s report card. *See id*. at 123.

At the conclusion of the hearing, the Orphans' Court held the matter under advisement. Following briefing by the parties and the GAL, the court entered decrees terminating Father's parental rights. Father filed a timely notice of appeal and a contemporaneous statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The Orphans' Court complied with Rule 1925(a).[8]

Father presents the following issue for our review:

> 1. Whether the [Orphans' C]ourt erred and/or grossly abused its discretion in finding that [Mother and Stepfather] had prove[d] by clear and convincing evidence that their petition for involuntary termination of Father's . . . parental rights should be granted pursuant to 23 Pa.C.S.A. § 2511(a)(1) as the evidence would not support termination, as Father had no settled purpose of relinquishing parental claim to the child[ren,] neither has he refused or failed to perform parental duties?

Father's Brief at 7 (capitalization standardized).

_____

[8] The GAL filed a brief in support of termination.

An appellate court reviews an involuntary termination decree for an abuse of discretion, which limits its review to a determination of whether competent evidence supports the termination court's decree. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). An appellate court must accept the Orphans' Court's findings of fact and credibility determinations which the record supports. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). Where the record supports the Orphans' Court's factual findings, an appellate court may not disturb that court's ruling absent an error of law or abuse of discretion. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion exists where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See id*. Section 2511 of the Adoption Act governs the involuntary termination of parental rights. If the Orphans' Court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, then it must assess the petition under section 2511(b), which focuses on the Child's needs and welfare. *See* 23 Pa.C.S.A. § 2511; *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a Child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a Child or has refused or failed to perform parental duties.

\* \* \* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the Child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Concerning proof of subsection 2511(a)(1), this Court has stated:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a Child or a refusal or failure to perform parental duties. In addition,

> [s]ection 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a Child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a Child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and Child; and (3)

- 10 -

consideration of the effect of termination of parental rights
on the Child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted). Clear and convincing evidence is that which is so clear, direct, weighty, and convincing as to allow the trier of fact to reach a clear conviction, without hesitance, of the truth of the precise facts in issue. *See In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000).

The Orphans' Court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions. *See In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999); *see also In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (stating the Orphans' Court must consider the explanations offered by the parent facing termination of parental rights, to determine if the evidence clearly warrants the involuntary termination). Regarding post-abandonment conduct:

> to be legally significant, [it] . . . must be steady and consistent over a period of time, contribute to the psychological health of the Child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-Child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (internal citation omitted).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a Child. A Child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest

in the development of the Child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the Child and a genuine effort to maintain communication and association with the Child.

Because a Child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the Child's life.

***Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-Child relationship to the best of his or her ability, even in difficult circumstances.*** A parent must utilize all available resources to preserve the parental relationship[] and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-Child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the Child with . . . her physical and emotional needs.

***In re B., N.M.***, 856 A.2d at 855 (internal citations and quotations omitted) (emphasis added); ***see also In re E.S.M.***, 622 A.2d 388, 393 (Pa. Super. 1993) (noting while the failure to perform parental duties is excused where it is the product of obstructive tactics, a parent cannot obtain the benefit of that excuse unless she has exercised reasonable firmness in attempting to overcome the obstructive behavior).

Father asserts he did not manifest a positive intent to sever his parental relation, his work schedule was not abnormal, and his military deployments were part of his service. ***See*** Father's Brief at 12-17. He also asserts the children were too young for prolonged phone conversations, the time

- 12 -

difference in South Korea prevented him from participating in school and medical appointments or visiting the children more often, Mother prevented him from other visits and restricted his phone calls with the children, and he attempted to contact the children between the dates of the hearing. *See id*.

The Orphans' Court found Father's admirable decision to serve in the military did not cause his estrangement from the children, "but rather the decisions he has made while serving that have done so." Trial Court Opinion, 7/16/24, at 11. It noted he only saw the children twice since 2020 and on each occasion for less than the allotted time. *See id*. It further noted that since January 2023, Father has not been involved in the children's IEP meetings, communicated with their healthcare providers, or assisted with their homework. *See id*. at 11-12. It specifically found Father did not act with the "reasonable firmness" the law requires to overcome obstacles to the parent-child relationship, noting that he forgot R.D.'s birthday in 2023, struggled to recall where the children go to school or what grade his son was in, did not know the names of the children's doctors, did not know his son's medical diagnosis, could not recall if he attended the first day of school in 2023, and attended his sister's wedding in the United States without attempting to see the children. *See id*. at 12-13. The court further found notwithstanding some apparent hostility from Mother, Father failed to show fortitude in his attempts to contact the children between the two hearing dates, and did not participate in counseling. *See id*. at 13-14. Finally, the court noted that Stepfather assumed all the responsibilities of a father and even Father admitted he does

a great job. *See id*. at 15. Accordingly, the court found clear and convincing evidence to establish the conditions of section 2511(a)(1).

We perceive no abuse of discretion in the Orphans' Court's determination. Father failed to perform parental duties for at least the six months prior to the filing of the termination petition. The credited evidence shows he made no effort to attend school conferences or medical appointments and did not pursue family therapy. Even if the time difference with South Korea made his attendance difficult, the evidence shows he did not later follow up to stay informed about the children's treatments for their special needs, or to hear about their health or educational circumstances. In fact, he testified he left those matters to Mother and Stepfather, whose efforts he praised. His lack of knowledge about the children's doctors or teachers or grades or even R.D.'s diagnosis was not at all consistent with an attempt to perform parental duties. *See In re B., N.M.*, 856 A.2d at 855; *In re E.S.M.*, 622 A.2d at 393. *See also In re Adoption of C.P.D.*, 324 A.3d 11, 28 (Pa. Super. 2024) (finding father failed to perform parental duties where, *inter alia*, he did not send child cards or gifts, stay apprised on updates concerning the child or consistently visit and left all parental duties to others). Additionally, the record shows Father failed to take the steps necessary to overcome any resistance he faced from Mother; instead, he deferred to Mother and Stepfather to make all decisions and do all the work of parenting special needs children. *In re B., N.M.*, 856 A.2d at 855; *see also In re E.S.M.*, 622 A.2d at 393. The record the Orphans' Court relied upon established clear and

convincing evidence that Father failed to perform parental duties pursuant to section 2511(a)(1).[9]

Based on the foregoing, we affirm the decree involuntarily terminating Father's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/6/2025

---

[9] Father fails to assert a separate claim concerning 23 Pa.C.S.A. § 2511(b), which focuses on the developmental, physical, and emotional needs and welfare of the Child, *see* 23 Pa.C.S.A. § 2511(b), including "[i]ntangibles such as love, comfort, security, and stability," *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012), and a consideration of the parent-child bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Even had he preserved such a claim, he would be due no relief.

The Orphans' Court found there was "little if any bond" between Father and the children, and that a parental bond exists among Stepfather, who performs all the duties of a father, and the children. *See* Trial Court Opinion, 7/16/24, at 16. It found the children would benefit from the closure termination would provide. *See id*. Based on the testimony demonstrating Stepfather's minute and loving attention to each of the children and their special needs, and Father's renunciation of any part of that process, Father could not possibly show that termination of parental rights would have an adverse effect on the children. To the contrary, termination was plainly in their best interests.